UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 08/12/2022
```

-------------------------------------------------------------------X
                                           :

DEVIN WESLEY WATSON,                 :

                      Plaintiff,      :

                                      :               20-cv-8447 (LJL)

         -v-                         :

                                      :        OPINION AND ORDER

COMMISSIONER OF SOCIAL SECURITY   :

                                      :

                    Defendant.    :

                                      :
-------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

Plaintiff Devin Watson ("Plaintiff" or "Watson") invokes this Court's jurisdiction, pursuant to 42 U.S.C. § 405(g), to review a decision of the Commissioner of Social Security ("Defendant" or "Commissioner") denying Plaintiff's application for Social Security Disability benefits for lack of disability, Dkt. No. 1 at 1, and moves, pursuant to Federal Rule of Civil Procedure 12(c), for judgment on the pleadings, Dkt. No. 17. Plaintiff submits that the determination by the Administrative Law Judge ("ALJ") is not supported by substantial evidence because the ALJ improperly evaluated the opinion of Plaintiff's treating physician. Dkt. No. 18 at 8. Plaintiff therefore requests that the Court vacate the ALJ's decision and remand the matter for further administrative proceedings. *Id.* at 14–15.

Defendant cross-moves for judgment on the pleadings to affirm the Commissioner's finding that Plaintiff was not disabled for purpose of entitlement to Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("the Act"), 42 U.S.C. §§ 401–434. Dkt. No. 20 at 5. Defendant requests that this Court affirm the ALJ's decision. *Id.*

For the following reasons, Plaintiff's motion for judgment on the pleadings is denied, and Defendant's cross-motion for judgment on the pleadings is granted.

## BACKGROUND

### I.   Nonmedical Background

Watson was born in 1990 and was twenty-seven years old at the alleged onset date of his disability on November 7, 2015.  Dkt. No. 14 at 21, 211.  He completed high school and one year of college, and he previously worked as a tractor-trailer driver, ambulance worker, vehicle maintenance mechanic, overnight stocker, cook's helper, security guard, and cashier checker.  *Id.* at 20, 213, 226–27.

### II.   Relevant Medical History Prior to Disability Claim

Plaintiff was hospitalized on November 7, 2015 after he experienced neck pain with fatigue, nausea, and vomiting.  *Id.* at 26, 298.  Testing revealed he had bacterial meningitis, and Plaintiff received intravenous antibiotics as treatment.  *Id.* at 26.

On November 9, 2015, Joanne A. Crossen, ACNP,[1] examined Plaintiff and found he experienced pain with side to side neck movement and had difficulty touching his chin to his chest.  Dkt. No. 14-1 at 359.  Dr. Mitul A. Patel verified Nurse Crossen's examination and recommended a consultation for potential neurosurgery.  *Id.* at 360.  Attending doctor Dr. David B. Blalock noted that Plaintiff "feels better today with less headache" but that "neck stiffness and nausea as weakness persist."  Dkt. No. 14 at 298.  Plaintiff agreed to be transferred to a hospital with a neurologist and neurosurgeon given his MRI result, which suggested Plaintiff had an abscess.  *Id.* at 293–332; Dkt. No. 14-1 at 333–40, 411.

Due to an abnormal MRI "with suggestion of abscess," Plaintiff was transferred to another hospital for a neurology consultation on November 9, 2015.  Dkt. No. 14-1 at 344.  At the consultation on November 10, 2015, Maurio A. Riley, PA, noted Plaintiff reported neck pain

---

[1] The Court assumes ACNP to refer to acute care nurse practitioner.

and stiffness, headaches, fever, and chills. *Id.* at 348. Plaintiff also reported frequent urination and thirst for the previous five months. *Id.*

Dr. J. Robert Brennan examined Plaintiff on November 10, 2015 to assess Plaintiff's endocrine status prior to Plaintiff's surgery. *Id.* at 351. At this appointment, Plaintiff reported developing marked congestion, general malaise, fatigue, thirst, and polyuria.[2] *Id.* at 422. Plaintiff also reported drinking large amounts of fluids and frequent urination. *Id.* Plaintiff further reported developing neck pain and stiffness as well as nausea and vomiting. *Id.* A physical examination found Plaintiff "alert and oriented" with no abnormalities; Dr. Brennan only noted that Plaintiff had "very dry mucous membranes and [wa]s drinking water throughout the interview." *Id.* at 423. Dr. Brennan noted that imaging of Plaintiff's brain showed an enlarged pituitary and pituitary stalk with what appeared to be a rim enhancement. *Id*. at 422.

Neurosurgeon Dr. William K. Rambo performed surgery to drain Plaintiff's pituitary abscess on November 12, 2015. *Id.* at 364. Following his surgery, Plaintiff was directed to attend scheduled appointments with both the endocrinology and infectious disease departments. *Id.* at 355–56.

Plaintiff visited Dr. Brennan on November 30, 2015 for a postoperative assessment of his endocrine status. *Id.* at 414. Dr. Brennan noted that Plaintiff was "not feeling tired or poorly" and that instead he was "feeling well." *Id.* He further noted that Plaintiff suffered from polyuria only when he missed his DDAVP (Desmopressin) doses used to treat his diabetes insipidus. *Id.*

Dr. Rambo's write-up of Plaintiff's first postoperative visit with him on December 3, 2015 noted that Plaintiff was in "good spirits" and that "clinically he is doing well." *Id.* at 457. Dr. Rambo cleared Plaintiff to resume work in January 2016. *Id.* Plaintiff saw Dr. Brennan for

---

[2] Polyuria is a condition that involves the production of abnormally large volumes of dilute urine.

another follow-up visit on January 7, 2016.  *Id.* at 418, 508.  Plaintiff again reported feeling well, and not tired or poorly, and Dr. Brennan did not note any changes from Plaintiff's last visit.  *Id.*

### III.   Disability Claim

On May 13, 2017, Plaintiff filed a Title II application with the Social Security Administration ("SSA") for a period of disability and DIB, alleging disability beginning November 7, 2015 due to pituitary abscess, panhypopituitarism,[3] diabetes insipidus, hypokalemia, knee injury, short term memory loss, extreme fatigue, joint pains, and occasional hand numbness and swelling.  Dkt. No. 14 at 76–84.

On May 31, 2017, Plaintiff filed a disability report with the SSA identifying the following medical conditions: pituitary abscess, panhypopituitarism, diabetes insipidus, hypokalemia, knee injury, short term memory loss, extreme fatigue, joint pains, and occasional hand numbness and swelling.  *Id.* at 225.  Plaintiff noted that his conditions caused him pain or other symptoms, that his conditions also caused him to make changes in his work activity starting on January 1, 2016, and that he stopped working on February 10, 2016 because of his conditions.  *Id.* at 225–26.  As part of the report, Plaintiff identified his prescribed medications for diabetes insipidus, lack of cortisone, lack of thyroid hormones, neck pain, lack of potassium, bacterial meningitis, diabetes-related emergencies, and lack of testosterone.  *Id.* at 228.

On June 12, 2017, Plaintiff also submitted a report to the SSA on his activities of daily living.  *Id.* at 236–45.  Plaintiff reported that he is married and lives in a house with his family,

---

[3] Panhypopituitarism is a "state in which the secretion of all anterior pituitary hormones is inadequate or absent; caused by a variety of disorders that result in destruction or loss of function of all or most of the anterior pituitary gland."  647130 panhypopituitarism (PHP), Stedmans Medical Dictionary 647130.  Plaintiff himself described his condition at the administrative hearing:  "Due to the pituitary gland, I'm missing a major hormone for my kidney, which my kidney can't regulate my water correctly so I drink at least seven to eight gallons [of water] a day."  Dkt. No. 14 at 53.

where he helps walk and feed his family's "pets or other animals." *Id.* at 236–37. He noted that

he helps take care of his children: "I help with homework, feed, change diapers, getting them

dressed, etc." *Id.* at 237. Plaintiff also noted that his wife, mother, and in-laws help with

everything, "especially on [his] bad days when [his] illness are [sic] worse." *Id.* He specified

that he does not have issues with personal care but that he sets alarms or uses post-it notes as

reminders, and his wife reminds him of things. *Id* at 237–38. As for household chores, Plaintiff

indicated that he does laundry, house cleaning "sparingly," and dishes, and mows "with help."

*Id.* at 238. Plaintiff reported that he leaves the house every day to pick up his children from

school and that, if he leaves the house, he either walks or drives a car. *Id.* at 239. He also noted

that he shops for groceries once every two weeks for about forty-five minutes at a time. *Id.*

Regarding his hobbies and interests, Plaintiff indicated that due to his illnesses, he no longer

plays sports, that he requires help for yard work, and that he can only drive for an hour before he

needs to rest. *Id.* at 240. In the section for information about his abilities, Plaintiff reported that

he cannot lift much, that he cannot stand or walk for more than fifteen minutes, that he has to

change positions while sitting, that he has to climb stairs slowly, that he has knee pain, that he

cannot squat far, that he gets cramps when he reaches, that he experiences numbness or knuckle

pain at times, that colors are darker since his surgery, and that his hearing sometimes goes out

with a high pitched noise. *Id.* at 240–42. Plaintiff did not indicate needing assistive devices of

any kind. *Id.* at 242. He reported having problems paying attention because the pain and fatigue

make it hard to concentrate. *Id.* Plaintiff further noted that his pain causes him to take regular

breaks between walking and driving and that it sometimes keeps him from visiting family and

picking his kids up or playing with them. *Id.* at 245.

After filing a DIB claim with the SSA and submitting the necessary reports, Plaintiff saw Dr. Julia Kaci for a consultative examination on July 17, 2017.  Dkt. No. 14-1 at 497–501.  Dr. Kaci noted Plaintiff was diagnosed with meningitis and pituitary abscess in 2015, and that he has since suffered from panhypopituitarism and related conditions.  *Id.* at 497.  Plaintiff reported taking several medications to treat his hormone deficiency and diabetes insipidus.  *Id.*  Dr. Kaci noted that Plaintiff drinks up to four gallons per day and urinates every one to two hours, which interferes with his sleep.  *Id.*  Dr. Kaci also noted that Plaintiff complains of intermittent arthralgias, which are generalized, and muscle cramps, especially in his legs.  However, Dr. Kaci noted no swelling of the joints and that Plaintiff's joint pain is intermittent and starts with walking or standing more than fifteen minutes.  *Id.*  Plaintiff further told Dr. Kaci that he showers and dresses daily, takes care of his three children three days per week, shops and cleans twice per week, and cooks something once per week.  Dr. Kaci noted that while Plaintiff "appeared to be in no acute distress," his gait is slightly antalgic, slightly favoring the right knee; that he is unable to walk on his heels and toes without difficulty; that he cannot squat down all the way; that he used no assistive device; and that he needed no help changing for the exam or getting on and off the exam table.  *Id.* at 498–99.

Dr. Kaci also conducted a full physical examination that yielded normal results across the board, specifying that an x-ray of Plaintiff's knee showed no bony abnormality.[4]  *Id.* at 499–500.  Dr. Kaci concluded that Plaintiff would have moderate limitation on prolonged walking, climbing stairs, kneeling, squatting, lifting, standing, carrying, pushing, and pulling.  She also noted Plaintiff would be limited by his urinary frequency.  Finally, she stated that Plaintiff would

---

[4]A full physical examination includes examination of: skin and lymph nodes; head and face; eyes, ears, nose, and throat; neck; chest and lungs; heart; abdomen; musculoskeletal; neurologic; extremities; and fine motor activity of hands.  Dkt. No. 14-1 at 499–500.

need to avoid driving and operating machinery because of his daytime sleepiness and fatigue.  *Id.* at 496–502.  Dr. Kaci identified Plaintiff's conditions as panhypopituitarism, chronic fatigue, chronic right knee pain, chronic arthalgias, and chronic low back pain.  *Id.* at 500.

On July 31, 2017, state agency medical consultant S. Lawrence, SDM, reviewed Plaintiff's medical record and found Plaintiff capable of light work with occasional climbing, balancing, stooping, kneeling, crouching, and crawling.  Dkt. No. 14 at 81.

Almost three months after Plaintiff's initial DIB claim, the SSA denied Plaintiff's claim on August 4, 2017.  *Id.* at 86.  The SSA "determined that [Plaintiff's] condition is not severe enough to keep [him] from working" and that "[b]ased on [Plaintiff's] description of [his] job as a truck driver, [his] condition does not prevent [him] from performing this work."  *Id.* at 90.  On September 14, 2017, Plaintiff appealed this determination and requested a hearing.  Dkt. No. 1 at 1; Dkt. No. 14 at 92.  The SSA acknowledged Plaintiff's request for a hearing on September 29, 2017.  Dkt. No. 14 at 93.

IV.    **Medical History Following Initial Denial of Disability Claim**

Prior to the hearing, Dr. Leah Kang-Oh, an endocrinologist, examined Plaintiff on February 20, 2018 regarding his panhypopituitarism.  Dkt. No. 14-2 at 645.  Plaintiff reported a fifty-pound weight gain, acid reflux, muscle aches, cramps, and bone aches.  *Id.*  Plaintiff's physical exam was within normal.[5]  *Id.* at 647.  Dr. Kang-Oh noted Plaintiff's symptoms included joint pain, urinary frequency, fatigue, and weight gain.  *Id.* at 646.  She noted Plaintiff

---

[5] The phrase "within normal," used by the ALJ in her decision, refers to the results of a comprehensive physical (or other exam) all being "Normal."  Dkt. No. 14-1 at 595.  In this case, Dr. Kang-Oh's physical exam consisted of a list of areas or features of the patient's body to check: constitutional, eyes, ears, neck exam, respiratory, skin, musculoskeletal, extremity, neurological, psychiatric.  *Id.* at 595.  The ALJ referred to Plaintiff's results as "within normal" because under the "Findings" column for each of these items, the doctor noted the result as "Normal."  *Id.*

attributes his fatigue and weight gain to his panhypopituitarism and that he has difficulty exercising due to low energy levels and chronic knee pain.  *Id.* at 647–48.

Dr. Kristen Hull, another endocrinologist, examined Plaintiff on August 28, 2018.  Dkt. No. 14-1 at 593.  She noted that Plaintiff reported "feeling much better" and that he stated "this is the best he has felt in 2 years."  *Id.* at 593.  Plaintiff's physical exam remained within normal. *Id.* at 595.

On September 25, 2018, Dr. Dominic Bioh examined Plaintiff to establish primary care. Dkt. No. 14-2 at 756.  Dr. Bioh found Plaintiff alert, oriented, well-nourished and well developed—his physical exam revealed no abnormalities.  *Id.* at 757.  Dr. Bioh noted that Plaintiff's symptoms stemming from pituitary diseases included polyuria and polydipsia, headaches, difficulty concentrating, and muscle weakness.  *Id.* at 756.  Dr. Bioh continued Plaintiff on his current medication.  *Id.* at 756–57.

Dr. Hull saw Plaintiff again on November 21, 2018 to follow-up on his panhypopituitarism.  Dkt. No. 14-1 at 586.  The "normal" results of Plaintiff's physical examination persisted.  *Id.* at 588.  Dr. Hull noted "no polyuria, blurry vision [and] polydipsia." *Id.* at 586.

The SSA eventually alerted Plaintiff of his hearing date of March 15, 2019.  Dkt. No. 14 at 108.  Plaintiff acknowledged this hearing date on December 31, 2018.  *Id.*

Having received a hearing date, Plaintiff visited Dr. Bioh a second time on January 9, 2019.  Plaintiff reported difficulty concentrating, muscle weakness, fatigue, malaise, neck pain, and headaches.  Dkt. No. 14-2 at 752.  Plaintiff described his neck pain as shooting, dull, and throbbing, with radiation and weakness bilaterally.  *Id.*  Dr. Bioh noted Plaintiff experienced headaches due to his pituitary disease.  *Id.*  Plaintiff described his headaches as throbbing,

intermittent, and causing lightheadedness and blurry vision. *Id.* Plaintiff's physical exam yielded normal results, and Dr. Bioh noted that Plaintiff was alert, oriented, well nourished, and well developed. *Id.* at 753. Plaintiff's psychiatric exam showed the same results as during his September 2018 visit. *Id.* Dr. Bioh noted that Plaintiff had not yet undergone a sleep study and referred him for an MRI of the cervical spine in addition to continuing him on his present medications. *Id.* at 752–54.

In February 2019, Dr. Bioh completed a functional capacity assessment regarding Plaintiff's physical impairments. *Id.* at 696–702. Dr. Bioh reported that Plaintiff experiences fatigue, dizziness, and headaches as well as symptoms of depression and anxiety. *Id.* at 696. He stated that Plaintiff's symptoms would constantly interfere with his ability to sustain attention and concentration and concluded that Plaintiff was capable of a low stress job. *Id.* at 698–99. Dr. Bioh further noted that Plaintiff could sit continuously for one to two hours, stand continuously between thirty minutes and one hour, and walk continuously between thirty minutes and one hour. *Id.* at 699. Dr. Bioh also noted that Plaintiff would require unscheduled breaks every thirty minutes, lasting ten to twenty minutes, and would have to sit, stand, and walk for a total of two hours over a normal eight-hour workday. *Id.* at 699–701. Finally, Dr. Bioh noted that Plaintiff would be able to lift and carry up to twenty pounds and that his impairments would cause him to be absent from work more than three days per month. *Id.* at 696–703.

## V.   Administrative Hearing

On March 15, 2019, the SSA held a hearing to review Plaintiff's DIB claim.

### A.   Plaintiff's Testimony

At the hearing, Plaintiff testified to the following. He typically only drives once per week and will otherwise take a cab or public transportation. Dkt. No. 14 at 37. Due to pain and fatigue, Plaintiff cannot drive for more than forty-five minutes. *Id.* at 56. Additionally, being in

a car for more than two hours causes extreme muscle pain.  *Id.*  He no longer possesses a commercial driver's license because he is unable to pass the physical examination.  *Id.* at 39.  In fact, Plaintiff was fired from his previous job as a truck driver because his fatigue and headaches caused him to forget to properly attach a trailer to his truck and because he hit a gate with the truck.  *Id.* at 41.  Plaintiff's fatigue also caused him to be late to work and fall asleep behind the wheel.  *Id.*

On a typical day, Plaintiff does housework for approximately twenty to thirty minutes and then rests for an hour to an hour and a half.  *Id.* at 47.  He is able to walk one and a half blocks to a local corner store but avoids using the stairs in his home by staying in his room most of the time.  *Id.* at 48.  At night, Plaintiff wakes up every thirty to forty-five minutes due to pain or to use the bathroom.  *Id.* at 50.  He also suffers from anxiety and depression due to his hormonal imbalance.  *Id.* at 52.

A pituitary gland issue—depriving Plaintiff of a hormone that regulates his kidneys—causes him to need to drink at least seven to eight gallons of water per day.  *Id.* at 53.  Consequently, Plaintiff needs to use the restroom every twenty minutes, and without medication, he would need to use the restroom every five to ten minutes.  *Id.* at 54.  If Plaintiff does not drink water for twenty to twenty-five minutes, his mouth becomes very dry and feels as though he is "in a desert."  *Id.* at 55.  Plaintiff also suffers from muscle spasms, cramps, stiffness, back and knee pain, and migraines.  *Id.*  If he is awake for five hours or more, his migraines grow to hurt his eyes and neck.  *Id.*

### B.   Vocational Expert's Testimony

At the same hearing, a vocational expert testified to the following.  Plaintiff's past work includes: tractor trailer driver, ambulance driver, transportation manager, vehicle maintenance mechanic, overnight stocker, cook helper, security guard, and cashier checker.  *Id.* at 58–62.  An

individual with Plaintiff's age, education, work experience, and residual functional capacity

("RFC") could perform his past work as a security guard or cashier checker as well as the jobs of

marker, router, and electrical equipment assembler.  *Id.* at 63.  An employer would likely not

tolerate off task time of twenty percent or more and would not tolerate more than one absence

per month.  *Id.* at 64, 67.  An employer would be required to tolerate three bathroom breaks per

hour under regulations, unless the bathroom breaks are twenty minutes or longer.  *Id.* at 68–69.

## VI.    The ALJ's Decision

On September 3, 2019, the ALJ issued a decision finding that Plaintiff was not under a

disability within the meaning of the Social Security Act.  *Id.* at 7–26.

"Regulations issued pursuant to the Act set forth a five-step process to aid the

Commissioner in determining whether a particular claimant is disabled."  *Robles v. Colvin*, 2019

WL 7790854, at *11 (S.D.N.Y. Apr. 9, 2019); *see also* 20 C.F.R. §§ 404.1520(a)(4),

416.920(a)(4).  Prior to step five, if a claimant's impairment(s) "does not meet or equal a listed

impairment, [the Commissioner] will assess and make a finding about [a claimant's] residual

function capacity."  20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  The claimant bears the

burden of proof on the first four steps of the analysis.  *DeChirico v. Callahan*, 134 F.3d 1177,

1180 (2d Cir. 1998).  The burden shifts to the Commissioner to show that the claimant is capable

of other work on the fifth step.  *Id.*

The ALJ employed the five-step analysis set forth in 20 C.F.R. § 404.1520(a) that ALJs

are required to follow in evaluating a disability claim.  *See Cichocki v Astrue*, 729 F.3d 172, 173

n.1 (2d Cir. 2013).  The ALJ considered: (1) whether Plaintiff engaged in substantial gainful

activity; (2) whether he had a medically determinable impairment that was "severe" or a

combination of impairments that was "severe"; (3) whether his impairment or combination of

impairments was of a severity to meet or medically equal the criteria of an impairment listed in

20 C.F.R. Part 404, Subpart P, App. 1; (4) whether he had the RFC to perform the requirements

of his past relevant work; and (5) whether he was able to do any other work considering his RFC,

age, education, and work experience.  20 C.F.R. §§ 404.1520, 416.920; *see* Dkt. No. 14 at 11–12.

At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful

activity from his alleged onset date of November 7, 2015.  Dkt. No. 14 at 13.  At step two, the

ALJ found that Plaintiff suffered from several severe impairments that significantly limited his

ability to perform basic work activities as required by SSR 85-28—namely, sleep apnea, obesity,

diabetes insipidus, pituitary abscess, panhypopituitarism, hypokalemia, arthritis, and peripheral

neuropathy.  *Id.*  At the third step of the inquiry, the ALJ determined that, despite the above

impairments, Plaintiff's impairments did not, individually or in combination, meet or equal the

criteria of an impairment identified in the Commissioner's "Listings of Impairments" in 20

C.F.R. 404, Subpart P, Appendix 1, with particular reference to Listings 1.02 and 1.03 (arthritis

in the lower extremities), 3.10 (sleep apnea), 3.09 (cor pulmonale), 9.00 (endocrine disorders),

11.00 (neurological disorders), and 11.14 (peripheral neuropathy).  *Id.* at 14–15.

At step four, the ALJ found that Plaintiff possessed the RFC to perform light work as

defined in 20 C.F.R § 404.1567(b) that avoids all kneeling, crouching, crawling, and climbing of

ladders, ropes, and scaffolds as well as more than occasional balancing, stooping, and climbing

stairs or ramps.  *Id.* at 15.  The ALJ specified that Plaintiff could tolerate occasional exposure to

extreme heat, extreme cold, dust odors, fumes and gases, and that he must have ready access to a

bathroom.  *Id.*  The ALJ afforded significant weight to the opinion of Dr. Kaci that, as of July

2017, Plaintiff had a "moderate limitation on prolonged walking, climbing stairs, kneeling,

squatting, lifting, carrying, pushing and pulling" and that he also had a "limitation due to his

urinary frequency." *Id.* at 17.  Dr. Kaci also stated that Plaintiff "would need to avoid driving

and operating machinery" due to his "daytime sleepiness and fatigue." *Id.* The ALJ afforded

little weight to Dr. Bioh's functional capacity assessment of the Plaintiff, finding that "the

totality of the evidence does not support Dr. Bioh's assessment of [Plaintiff's RFC]." *Id.* at 19.

According to the ALJ, Dr. Bioh's RFC is "internally inconsistent" as well as "inconsistent with

the unremarkable clinical record and the [Plaintiff's] admitted activities of daily living." *Id.* The

ALJ afforded Dr. Kaci's examination of the Plaintiff greater weight in part because of Dr. Kaci's

experience evaluating claimants for disability and familiarity with Social Security disability

program rules and regulations. *Id.* at 20. Finally, at the last step, the ALJ found that Plaintiff is

capable of performing past relevant work as a security guard and cashier checker, as these do not

require the performance of work-related activities precluded by Plaintiff's RFC. *Id.*

In her decision, the ALJ found Plaintiff meets the insured status requirements of the

Social Security Act through March 31, 2021. *Id.* at 12. Plaintiff has not engaged in substantial

gainful activity since November 7, 2015, the alleged onset date. *Id.* at 13. Plaintiff is severely

impaired by sleep apnea, obesity, diabetes insipidus, pituitary abscess, panhypopituitarism,

hypokalemia, arthritis, and peripheral neuropathy. *Id.* The ALJ determined Plaintiff has the

RFC to perform light work that:

> Avoids all kneeling, crouching, crawling and climbing of ladders, ropes and
> scaffolds as well as more than occasional balancing, stooping and climbing stairs
> or ramps. [Plaintiff] is able to tolerate occasional exposure to extreme heat, extreme
> cold, dust odors, fumes and gases. [Plaintiff] must have ready access to a bathroom.

*Id.* at 15. The ALJ found Plaintiff capable of performing past relevant work and other jobs

existing in the national economy and therefore concluded that Plaintiff has not been under a

disability, as defined in the Social Security Act, from November 7, 2015, through the date of the

ALJ's decision. *Id.* at 21–22.

**VII.     Request for Review by Appeals Council**

Following the administrative hearing, Plaintiff requested a review by the SSA Appeals

Council.  Dkt. No. 1 at 2; Dkt. No. 14 at 289.  The Appeals Council denied Plaintiff's request for

review on August 12, 2020, making the ALJ's decision the "final decision" of the Commissioner

subject to judicial review pursuant to 42 U.S.C. § 405(g).  Dkt. No. 1 at 2.

**VIII.    Procedural History**

On October 9, 2020, Plaintiff filed a complaint against the Commissioner of Social

Security invoking the jurisdiction of this Court pursuant to 42 U.S.C. § 405(g) to review the

Commissioner's denial of Plaintiff's application for Social Security Disability benefits for lack

of disability.  Dkt. No. 1.  On September 1, 2021, Plaintiff filed a motion for judgment on the

pleadings.  Dkt. No. 17.  On November 2, 2021, Defendant filed a cross-motion for judgment on

the pleadings.  Dkt. No. 19.  Plaintiff filed a reply on December 2, 2021.  Dkt. No. 22.

## LEGAL STANDARD

Under Rule 12(c), a judgment on the pleadings is appropriate where "the movant

establishes that no material issue of fact remains to be resolved such that a judgment on the

merits can be made merely by considering the contents of the pleadings."  *Ponzini v. Comm'r of*

*Soc. Sec.*, 2021 WL 4441512, at *6 (S.D.N.Y. Sep. 28, 2021).

"The scope of review in an appeal from a social security disability determination involves

two levels of inquiry."  *Robles*, 2019 WL 7790854, at *10 (internal citations omitted); *see also*

*Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987); *Dwyer v. Astrue*, 800 F. Supp. 2d 542, 546

(S.D.N.Y. 2011).  The court must first review the Commissioner's decision to determine whether

the Commissioner applied the correct legal principles in determining that the plaintiff was not

disabled.  *Acosta Cuevas v. Comm'r of Soc. Sec.*, 2021 WL 363682, at *7 (S.D.N.Y. Jan. 29,

2021) (citing *Estrella v. Berryhill*, 925 F.3d 90, 95 (2d Cir. 2019)).  A reviewing court may not

affirm an ALJ's decision if it cannot determine whether the correct legal standards were applied, even if the decision is supported by substantial evidence. *Id.*; *see also, e.g.*, *Andrew G. v. Comm'r of Soc. Sec.*, 2020 WL 5848776, at *1 (N.D.N.Y. Oct. 1, 2020). "Second, the court must decide whether the Commissioner's decision is supported by substantial evidence in the record." *Acosta Cuevas*, 2021 WL 363682, at *7; *see also Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 447 (2d Cir. 2012) (per curiam) ("[The court] conduct[s] a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision[.]" (internal quotation marks omitted)). A court may set aside the Commissioner's decision only if it is based on legal error or its findings are not supported by substantial evidence. *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008). "[T]he court may not substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a *de novo* review." *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991).

## DISCUSSION

Presently before the Court are the parties' cross motions for judgment on the pleadings. Plaintiff moves for judgment on the pleadings and argues that the case should be remanded to the ALJ for two reasons. First, Plaintiff argues that the ALJ's decision was legally erroneous by failing to consider Dr. Bioh's medical opinion. Dkt. No. 18 at 9; Dkt. No. 22 at 3. Second, Plaintiff argues that the ALJ's disability determination was not supported by substantial evidence. Dkt. No. 22 at 3. Defendant argues that the Commissioner's decision should be affirmed because it is free of legal error and supported by substantial evidence. The Court addresses each of Plaintiff's arguments in turn.

## I.      The ALJ Did Not Err in Discounting Dr. Bioh's Medical Opinion

Plaintiff claims that the ALJ's RFC assessment and her rejection of Dr. Bioh's medical opinion amount to legal error.  Plaintiff contends the ALJ provided improper and invalid reasons for rejecting Dr. Bioh's opinion.  Dkt. No. 18 at 10.  More specifically, Plaintiff argues that the ALJ's statements explaining her dismissal of Dr. Bioh's opinion were conclusory, that in dismissing Dr. Bioh's opinion the ALJ inappropriately relied on certain daily activities, and that the ALJ overstepped her expertise with regard to Dr. Bioh's opinion in particular.  *Id.* at 13–14. Plaintiff contends that "had Dr. Bioh's opinion been adopted, Plaintiff would have been found disabled."  *Id.* at 15.

Under the Act, any individual considered to have a disability is entitled to benefits.  42 U.S.C. §§ 423(a)(1), 1382.  The Act defines the term "disability" as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  *Id.* § 423(d)(1)(A).  An individual is disabled under the Act if he or she suffers from an impairment which is "of such severity that he [or she] is not only unable to do his [or her] previous work but cannot engage in any other kind of substantial gainful work which exists in the national economy."  *Id.* § 423(d)(2)(A). "[W]ork which exists in the national economy means work which exists in significant numbers either in the region where such individual lives or in several regions of the country."  *Id.* (internal quotation marks omitted).

In determining whether a claimant is disabled, an ALJ must necessarily look to a claimant's physicians and their findings.  Traditionally, an ALJ looked to a set of factors— known as the *Burgess* factors—to determine whether a claimant's physician is a treating physician entitled to controlling weight in accordance with the so-called "treating physicians'

rule" per 20 C.F.R. §§ 404.1527(c), 416.927(c).  *See Burgess*, 537 F.3d at 117.[6]  However, on

January 18, 2017, the SSA issued new regulations that govern the evaluation of medical opinions

for claims filed on or after March 27, 2017 by publishing the "Revisions to Rules Regarding the

Evaluation of Medical Evidence."  *See* 82 Fed. Reg. 5, 844 (Jan. 18, 2017); *see also Latifu v.

Comm'r of Soc. Sec.*, 2022 WL 2532193, at *14 (S.D.N.Y. May 4, 2022).  The Commissioner's

new regulations apply to Plaintiff's claim because Plaintiff filed his claim for benefits on May

13, 2017.  Dkt. No. 18 at 2.

　　　　Under the new regulations, an ALJ must no longer assign particular evidentiary weight to

the various treating sources in a medical record and their opinions.  Instead, the new regulations

give broad discretion to adjudicators to evaluate which medical opinions are ultimately

persuasive.  20 C.F.R. § 404.1520(a)–(c); *see Latifu*, 2022 WL 2532193, at *14.  The ALJ must

consider all of the medical opinions and determine how persuasive she finds them based on the

following factors: (1) supportability; (2) consistency; (3) the medical source's relationship with

the claimant; (4) the medical source's specialization; and (5) other relevant factors.  20 C.F.R.

§ 404.1520c(a)–(c).  "Supportability refers to the extent to which a medical source opinion is

supported by objective medical evidence and the medical source's explanations."  *Balotti v.

Comm'r of Soc. Sec.*, 2022 WL 1963657, at *4 (S.D.N.Y. Jun. 6, 2022) (citing 20 C.F.R.

§ 404.1520c(c)(1)); *Vellone o.b.o. Vellone v. Saul*, 2021 WL 319354, at *6 (S.D.N.Y. Jan. 29,

2021) ("[S]upportability is an inquiry confined to the medical source's own records that focuses

on how well a medical source supported and explained their opinion."), *report and*

---

[6] "The rule required an ALJ to assign the weight given to the medical opinions of a claimant's medical sources; an ALJ had to give controlling weight to a treating physician if those opinions were well supported by medically acceptable clinical and laboratory diagnostic techniques and are not inconsistent with the other substantial evidence in the case record."  *Acosta Cuevas*, 2021 WL 363682, at *9 (cleaned up).

*recommendation adopted*, 2021 WL 2801138 (S.D.N.Y. Jul. 6, 2021).  "Consistency refers to the

extent to which a medical source's opinion is consistent with other medical or non-medical

sources."  *Balotti*, 2022 WL 1963657, at *4 (citing 20 C.F.R. § 404.1520c(c)(2)).  "[T]he greater

the consistency between a particular medical source/opinion and the other evidence in the

medical record, the stronger that medical opinion becomes."  *Vellone*, 2021 WL 319354, at *6.

"[C]onsistency is an all-encompassing inquiry focused on how well a medical source is

supported, or not supported, by the entire record."  *Id*.  The final factor—a catch-all "other

factors"—mentions two particular considerations: (1) a medical source's familiarity with social

security disability program's policies and evidentiary requirements, and (2) whether later-

generated medical evidence makes a prior opinion more or less persuasive.  20 C.F.R.

§ 404.1520(c)(5).  "The ALJ must explain how [she] considered the supportability and

consistency factors, but is not required to explain how she considered the remaining factors."

*Latifu*, 2022 WL 2532193, at *14 (internal quotation marks omitted); *see also Byrd v. Kijakazi*,

2021 WL 5828021, at *15 (S.D.N.Y. Nov. 12, 2021).  However, "[a]n ALJ must not only

consider supportability and consistency in evaluating medical source opinions but also must

explain the analysis of those factors in the decision."  *Hilton v. Kijakazi*, 2022 WL 1451476, at

*4 (S.D.N.Y. May 9, 2022); *see also* 20 C.F.R. §§ 404.1520c(b), 416.920c(b); *Vellone*, 2021 WL

319354, at *6 ("[I]n cases where the new regulations apply, an ALJ *must* explain his/her

approach with respect to the first two factors when considering a medical opinion . . . ."

(emphasis in original)).  This articulation requirement is "intended to 'allow a . . . reviewing

court to trace the path of an adjudicator's reasoning.'"  *Balotti*, 2022 WL 1963657, at *4

(quoting Revisions to Rules Regarding The Evaluation of Medical Evidence, 82 Fed. Reg. 5844,

5858 (Jan. 18, 2017) ("Revisions")).

This Court will only review the ALJ's evaluation of Dr. Bioh's opinion, as Plaintiff takes no issue with the ALJ's weighing of other medical opinions.  The ALJ did not err in discounting Dr. Bioh's medical opinion in determining the Plaintiff's RFC.  The ALJ first summarized Dr. Bioh's RFC opinion in full.  Dkt. No. 14-1 at 19.  The ALJ then found Dr. Bioh's opinion unpersuasive, concluding it was unsupported, inconsistent with the medical record and Plaintiff's activities of daily living, and internally inconsistent.  *Id.* at 19–20.  After stating Dr. Bioh's opinion, the ALJ summarized her review of Dr. Bioh's medical opinion as follows:

> The undersigned finds that the totality of the evidence does not support Dr. Bioh's assessment of the claimant's residual functional capacity.  (Exhibit 16F).  The undersigned finds that the medical evidence, including the Doctor's own physical exam findings, do not support the degree of limitations in this assessment.  Dr. Bioh sets forth an extreme residual functional capacity which is inconsistent with the unremarkable clinical record and the claimant's admitted activities of daily living.  Moreover, Dr. Bioh's opinion is also internally inconsistent.  While the doctor states that the claimant would constantly be off task, the doctor then asserts that the claimant would be capable of low stress jobs.  . . .  As such, the undersigned finds this opinion unpersuasive.

*Id.*  Ultimately, the ALJ found that "the medical evidence, including [Dr. Bioh's] own physical exam findings, do not support the degree of limitations in [Dr. Bioh's] assessment."  *Id.* at 19.

The ALJ's explanation for rejecting Dr. Bioh's opinion adequately considers the supportability and consistency factors.  Under the Commissioner's new regulations, the ALJ is entitled to give Dr. Bioh's opinion and RFC assessment less weight than, for example, the opinion of Dr. Kaci.  However, the ALJ's explanation must rise above the level of conclusory statements and actually explain the ALJ's reasoning.  Simple mention of the two factors is not sufficient.  Some explanation—sufficient for the Court to review the ALJ's decision—is necessary.  *See, e.g.*, *Prieto v. Comm'r of Soc. Sec.*, 2021 WL 3475625, at *13 (S.D.N.Y. Aug. 6, 2021) ("[R]ather than analyzing the supportability and consistency factors as applied to [the Doctor's] opinion, the only reasoning the ALJ provided was entirely conclusory; the ALJ said

only that [the Doctor's] opinion was 'supported by the medical evidence of record and by her underlying examination.'  Such a conclusory statement is an insufficient explanation of the supportability factor and is grounds for remand." (internal citation omitted)); *Vellone*, 2021 WL 319354, at *9 ("[I]t is clear that the ALJ addressed Dr. Azeez's treating opinion . . . both with respect to supportability and consistency, as required by the new regulations . . . .  However, the ALJ's analysis with respect to those regulatory factors, at least with respect to 'consistency,' was lacking.").

Plaintiff does not dispute that the ALJ accurately and completely set forth Dr. Bioh's "explanations and what he considered in arriving at his opinion."  *Balotti*, 2022 WL 1963657, at *5.  Nor did the ALJ "improperly conflat[e] supportability and consistency."  *Id.* at *8.  With respect to supportability, the ALJ found that "the medical evidence, including the Doctor's own physical examination findings, d[id] not support the degree of limitations in th[e] assessement."  Those statements did not constitute just empty words; it is not difficult to "trace the path" of the ALJ's reasoning.  Dr. Bioh did not support his assessment with any physical examination findings.  In fact, earlier in her opinion, the ALJ detailed exactly what she was referring to.  At Plaintiff's first appointment with Dr. Bioh, his physical examination showed that he "was alert, oriented, well nourished and well-developed," he had no head or neck abnormalities, his cardiovascular examination showed a regular heart rate and rhythm and his respiratory examination showed that his lungs were clear.  He had a normal range of motion in all joints.  Most importantly, the neurological examination showed he was alert and oriented while his psychiatric examination showed that he had a normal mood, affect, and speech.  Dkt. No. 14 at 18.  The examination findings from January 2019 were identical, including that Plaintiff was alert and oriented and had "normal mood, affect and speech while his eye contract was good."

*Id.* It is apparent from the opinion why the ALJ believed Dr. Bioh's assessment not to be supported. It did not require the ALJ to impermissibly assume "the mantle of a medical expert" to do so. *Amarone v. Comm'r of Soc. Sec.*, 2017 WL 4326014, at *10 (S.D.N.Y. Sep. 8, 2017). Dr. Bioh's RFC assessment was based on the notion that Plaintiff experienced fatigue, dizziness, and headaches as well as symptoms of depression and anxiety that would "constantly" "interfere with his ability to sustain attention and concentration." Dkt. No. 14-2 at 698. Plaintiff self-reported fatigue to Dr. Bioh. *Id.* at 752, 756. However, "the exam fin[d]ings consistently make no mention of fatigue. Rather, the physicians describe him as alert and oriented." Dkt. No. 14 at 19. The psychiatric examinations showed that he had normal mood, affect, and speech. *Id.* The ALJ thus explained the basis for her conclusion regarding Dr. Bioh's assessment. The Court need not necessarily agree with the ALJ's conclusion. It is sufficient that it was a reasoned one.[7]

As for consistency, the ALJ found that Dr. Bioh's medical opinion was "internally inconsistent" and that it was "inconsistent with the unremarkable clinical record and the claimant's admitted activities of daily living." *Id.* The ALJ adequately explained her reasoning. As to internal inconsistency, "[w]hile the doctor states that the claimant would constantly be off track, the doctor then asserts that the claimant would be capable of low stress jobs." *Id.* at 19–20. The opinion also documents Plaintiff's "unremarkable clinical record," including findings that during the time he allegedly lacked RFC he was doing well clinically and was able to work. *Id.* at 17.

---

[7] Plaintiff argues that the ALJ's reasoning was limited to the statement that Dr. Bioh's assessment was not supported by the totality of the evidence, characterizing that terminology as "boilerplate." Dkt. No. 18 at 12. But that misstates the ALJ opinion. The ALJ did state that "the totality of the evidence" did not support Dr. Bioh's assessment, but she then went on to specify in what respect Dr. Bioh's opinion was not supported. Dkt. No. 14-1 at 19.

Plaintiff argues that the ALJ failed to provide any examples of how Dr. Bioh's opinion is inconsistent with Plaintiff's activities of daily living and that she failed to build any logical connection between Plaintiff's daily activities and Dr. Bioh's opinion.  Dkt. No. 18 at 11.[8]  But the bridge was apparent and not illogical.  Plaintiff was able to drive, to shop and manage financial transactions, to get meals ready for his children and supervise their homework, and to travel between the first and third floors of his house; indeed, he was able to provide more care for his children due to his mother-in-law's recent incapacitation.  Dkt. No. 14 at 19.  It may be that "caring for one's children is a task a parent is obligated to perform," Dkt. No. 18 at 11, but not every parent is able to do it.  Plaintiff was able to do so and in a manner that the ALJ logically could conclude was inconsistent with Dr. Bioh's RFC assessment.

It also was reasonable for the ALJ to conclude, from a statement that someone would always be off task, that the individual would be unable to hold any job, even a low stress job.  This fact is corroborated by the vocational expert during the hearing.  Dkt. No. 14 at 64 ("Most employers will tolerate ten percent off task.  Most employers will not tolerate 20 percent of[f] task.").  Thus, when Dr. Bioh noted that Plaintiff would be capable of having a low stress job, the ALJ logically found this internally inconsistent.  Plaintiff would have this Court believe that the above thought process is legal error because the ALJ substituted her own expertise or view of the medical proof for a physician's opinion.  Dkt. No. 18 at 12.  But the ALJ did not imply that concentration is inherently tied to stress tolerance, which Plaintiff claims would be a medical

---

[8] The ALJ did provide an example of how she found Dr. Bioh's medical opinion to be internally inconsistent.  Notably, providing examples is not a requirement under the regulations, though examples help demonstrate that an ALJ considered and explained the factors of supportability and consistency.

conclusion.  Instead, the ALJ related lack of concentration to difficulties holding a job, including

a low stress job.  This is not a medical observation or judgment.

Furthermore, the ALJ's reliance on Plaintiff's self-reported daily activity was not legal

error.  It is true that courts generally agree that an ability to perform daily activities does not

necessarily in and of itself translate to an ability to perform light work.  *See Bialek v. Astrue*,

2013 WL 316165, at *4 (E.D.N.Y. Jan. 28, 2013) ("Although daily activities are a relevant

consideration, [plaintiff's] ability to tend to his personal needs and travel to appointments is not

indicative of his ability to perform light work." (citations omitted)); *Archambault v. Astrue*, 2010

WL 5829378, at *30 (S.D.N.Y. Dec. 13, 2010) (finding that "Plaintiff's ability to engage in

certain limited daily activities does not provide evidence of his ability to perform [light] work

unless he can perform those daily activities at a level consistent with the demands of [light]

work" and that "[a]s the ALJ failed to discuss the rigor of plaintiff's daily activities and

presumed that those activities demonstrated a lack of disability, she committed legal error"

(citations omitted)), *report and recommendation adopted*, 2011 WL 649665 (S.D.N.Y. Feb. 17,

2011).  Nevertheless, an ALJ may rely upon a Plaintiff's reported activities of daily living in

formulating an RFC if that determination is supported by evidence in the record.  *See Acevedo v.

Saul*, 2021 WL 6110933, at *9 (S.D.N.Y. Dec. 27, 2021) ("The ALJ could properly conclude

from the evidence in the record that the objective signs and symptoms documented in the record

do not support the level of limitation described by the claimant." (internal quotation omitted));

*Sink v. Berryhill*, 2019 WL 1915291, at *5 n.5 (S.D.N.Y. Apr. 29, 2019) ("Similar to the

claimant in *Garner*, Plaintiff testified that he washes and dresses himself and performs some

household chores and, like the ALJ in that case, the ALJ here properly considered those activities

and determined that they indicated a broad range of activity.").  In the present case, Plaintiff

testified that he washes and dresses himself and performs some household chores, grocery shops, and cares for his family.  Dkt. No. 14 at 46–52.  It was not legal error for the ALJ to consider those activities in determining that Dr. Bioh's RFC assessment was more limited than necessitated by the objective medical evidence.

The ALJ did not err in dismissing Dr. Bioh's medical opinion because the ALJ applied the correct legal standard in explaining how she weighed his opinion.[9]

## II.    The ALJ's Decision Is Supported by Substantial Evidence

The Court now turns to the question of whether the ALJ's decision, namely the RFC determination, is supported by substantial evidence.  Plaintiff claims that the ALJ's RFC determination is not supported by substantial evidence because she failed to properly evaluate Dr. Bioh's opinion.  The Court finds that substantial evidence supports the ALJ's decision and RFC.

"Substantial evidence is 'more than a mere scintilla' and 'means such relevant evidence as a reasonably mind might accept as adequate to support a conclusion.'"  *Lesterhuis v. Colvin*, 805 F.3d 83, 87 (2d Cir. 2015) (quoting *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996)); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).  It is a "very deferential standard of review— even more so than the clearly erroneous standard."  *Brault*, 683 F.3d at 448.  The ALJ's findings must be upheld if supported by substantial evidence, even if there is also substantial evidence supporting the claimant's position.  *See Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010); *see*

---

[9] Plaintiff also claims that he would have been found disabled had the ALJ given credence to Dr. Bioh's RFC.  The Court need not address this argument because it holds that the ALJ did not err in considering Dr. Bioh's opinion.  However, the Court notes that Dr. Bioh himself, in assessing the Plaintiff, found that Plaintiff is "[c]apable of low stress jobs" even given the option to say that Plaintiff is "[i]ncapable of even 'low stress' jobs."  Dkt. No. 14-2 at 699.  Dr. Bioh's statement suggests he did not think Plaintiff was incapable of holding any job, a factor relevant to finding disability under the Act.

*also Kande v. Comm'r of Soc. Sec.*, 2020 WL 3871218, at *5 (S.D.N.Y. Jul. 9, 2020) ("The

Commissioner's 'finding will be sustained if supported by substantial evidence, even where

substantial evidence may support the plaintiff's position and despite that the court's independent

analysis of the evidence may differ from' the Commissioner's." (quoting *Rosado v. Sullivan*, 805

F. Supp. 147, 153 (S.D.N.Y. 1992)) (citations omitted)).

     The ALJ determined that Plaintiff has the RFC to perform light work as defined by 20

C.F.R. § 404.1567(b):

> Light work involves lifting no more than 20 pounds at a time with frequent lifting
> or carrying of objects weighing up to 10 pounds.  Even though the weight lifted
> may be very little, a job is in this category when it requires a good deal of walking
> or standing, or when it involves sitting most of the time with some pushing and
> pulling of arm or leg controls.  To be considered capable of performing a full or
> wide range of light work, you must have the ability to do substantially all of these
> activities.  If someone can do light work, we determine that he or she can also do
> sedentary work, unless there are additional limiting factors such as loss of fine
> dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).  The ALJ further limited this determination, specifying that Plaintiff

should "avoid[] all kneeling, crouching, crawling and climbing of ladders, ropes and scaffolds as

well as more than occasional balancing, stooping and climbing stairs or ramps."  Dkt. No. 14 at

15.  The ALJ added that Plaintiff can "tolerate occasional exposure to extreme heat, extreme

cold, dust odors, fumes and gases" and that he requires "ready access to a bathroom."  *Id.*

     A step-by-step review of the ALJ's decision-making process shows that each

determination made by the ALJ—including her final disability determination—was supported by

substantial evidence.  Plaintiff only disputes the ALJ's decision at steps four and five.

     At step one, the ALJ determined that Plaintiff met the insured status requirements of the

Act through March 31, 2021.  *Id.* at 12 (citing *id.* at 204).  The Court finds that the ALJ's

analysis at steps two and three of the sequential evaluation was adequately supported by the

medical evidence and the criteria of the relevant Listings.  Plaintiff does not dispute that the

ALJ's determinations at those steps were supported by substantial evidence. Plaintiff does dispute the ALJ's formulation of a new RFC for Plaintiff at step four and implicitly contends that, given Dr. Bioh's RFC assessment, the ALJ should have found at step four that Plaintiff is incapable of performing past work. In Plaintiff's view, the ALJ's analysis would have ended there, and Plaintiff would have been found disabled. Nevertheless, the Court finds that the ALJ's RFC determination was supported by substantial evidence in the record. The ALJ therefore correctly concluded, at step five, that Plaintiff was capable of performing past and other work given his RFC.

The Court reviews the ALJ's RFC assessment at step four for substantial evidence. "The ALJ is required to assess and make a finding regarding a claimant's RFC based on all the relevant medical and other evidence in the case record." *Galowitz v. Astrue*, 2012 WL 4762563, at *13 (S.DN.Y. Aug. 20, 2012); *see* 20 C.F.R. § 404.1520(e). The RFC represents "the most [Plaintiff] can still do despite [his] limitations." 20 C.F.R. § 404.1545(a)(1). At the hearing level, an ALJ has the responsibility of assessing a claimant's RFC. *See id.* § 404.1546(c); SSR 96-5p, 61 Fed. Reg. 34,471-01 (July 2, 1996). The ALJ's RFC determination is administrative, not medical. Indeed, the ALJ's determination need not "perfectly correspond with any of the opinions of medical sources cited in [her] decision," because she is "entitled to weigh all of the evidence available to make an RFC finding that [i]s consistent with the record as a whole." *Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013) (internal citation omitted). "Regardless of how many medical source statements the ALJ receives—or the weight he assigns to them—the determination of the claimant's RFC is reserved to the ALJ, who is not required to accept, or follow, any one medical opinion *in toto*." *Cepeda v. Comm'r of Soc. Sec.*, 2020 WL 6895256, at *11 (S.D.N.Y. Nov. 24, 2020).

The ALJ's RFC determination largely incorporates the opinions expressed by Dr. Kaci, a consultative examiner, in addition to Plaintiff's lengthy medical records.  The Court has already determined that it was not legal error for the ALJ to choose to disregard Dr. Bioh's medical opinion, and specifically his RFC assessment.  According to the ALJ, Dr. Kaci has experience in diagnosing disability insurance claimants and her treatment notes reflect an awareness and understanding of each of the impairments that Plaintiff claimed to be disabling.  Dkt. No. 14 at 20.  Dr. Kaci conducted a full physical and mental examination of Plaintiff on July 17, 2017.  Dkt. No. 14-1 at 496–502.  Dr. Kaci described much of the limitations and pain points that Plaintiff himself testified to during the ALJ hearing.  This includes frequent urination, the need to nap multiple times a day, and being limited to standing or walking for fifteen minutes at a time.  *Id.*  Dr. Kaci also noted Plaintiff's 2010 knee injury from the Navy and the pain it causes.  *Id.*  Under "Activities of Daily Living," Dr. Kaci noted that Plaintiff: cooks once a week, cleans and does laundry biweekly, shops biweekly, takes care of his children three days a week, and showers, bathes, and dresses daily.  *Id.* at 498.  This also parallels what Plaintiff himself testified to during the hearing.  The ALJ also relied on Dr. Kaci's "Medical Source Statement" in formulating Plaintiff's RFC.  Dr. Kaci found that Plaintiff "has moderate limitation to prolonged walking, climbing stairs, kneeling, squatting, standing, lifting, carrying, pushing, and pulling," in addition to "moderate limitation to activities requiring time away from home, because of his urinary frequency."  *Id.*  Ultimately, Dr. Kaci found Plaintiff's physical examination within normal, though she noted numerous physical limitations resulting from Plaintiff's conditions.  *Id.* at 499–500.  The ALJ accounted for these limitations and Dr. Kaci's notes on Plaintiff's daily activities, in her RFC.

The ALJ's RFC determination was also supported by treatment notes from a number of Plaintiff's other physicians and Plaintiff's medical record.  For example, on May 21, 2018, Plaintiff indicated that he felt tired and had little energy nearly every day over the previous two weeks.  Dkt. No. 14-2 at 705.  He also indicated that several days in the previous two weeks, he had trouble concentrating on things.  *Id.*  Plaintiff ultimately reported that these problems made it "somewhat difficult" to "do [his] work, take care of things at home, or get along with other people," as opposed to very or extremely difficult.  *Id.*  On July 31, 2017, state agency medical consultant Lawrence found Plaintiff capable of light work with occasional climbing, balancing, stooping, kneeling, crouching, and crawling.  Dkt. No. 14 at 81.  Immediately before Plaintiff's visit with Dr. Bioh, he saw endocrinologist Dr. Hull on August 28, 2018.  Dkt. No. 14-1 at 593.  In addition to finding Plaintiff's exam within normal, Dr. Hull noted that Plaintiff reported "feeling much better" and that he stated "this is the best he has felt in 2 years."  *Id.* at 593.  Dr. Hull saw Plaintiff again on November 21, 2018 in a follow-up visit for Plaintiff's panhypopituitarism.  *Id.* at 586.  Dr. Hull noted "no polyuria, blurry vision [and] polydipsia," in addition to finding Plaintiff's physical exam within normal.  *Id.* at 586, 588.

The RFC assessment was also largely supported by Plaintiff's own testimony at the administrative hearing, as he conceded that he was able to manage his various symptoms in performing daily activities such as driving.  Dkt. No. 14 at 54.  Plaintiff also consistently reported that he was able to perform numerous daily activities with complete independence, through the relevant period, including shopping for, lifting, and driving home groceries.  *Id.* at 46–50.  As noted above, it is proper for an ALJ to consider Plaintiff's performance of daily activities in assessing their RFC.  Plaintiff's own testimony as to his daily activities therefore lends support to the RFC determination.  *See Browne v. Comm'r of Soc. Sec.*, 131 F. Supp. 3d

89, 101 (S.D.N.Y. 2015) (finding that the claimant's reported "numerous activities of daily living" such as preparing his own meals, doing laundry, and using public transportation independently "supported the conclusion that [Plaintiff] could do light work").

Finally, this Court finds that substantial evidence supports the ALJ's ultimate determination—at step five—that jobs that Plaintiff is able to perform exist in significant number in the national economy.  Here, the ALJ relied on the testimony of an impartial vocational expert.  The vocational expert confirmed that Plaintiff's frequent need to urinate would not have a vocational impact because "according to OSHA [employers] have to allow their employee to be able to take bathroom breaks."  Dkt. No. 14 at 68.  Even more specifically, the vocational expert confirmed that it would not be "problematic" if "somebody [] stepped away to go to the bathroom three times in an hour."  *Id.*  Plaintiff would have to step away to go to the bathroom about three times in an hour in any given job given his daily water intake.  *Id.* at 54.  The expert further confirmed that there existed a significant number of jobs for Plaintiff to perform in the national economy, both in the "light exertion" category or "sedentary exertion."  *Id.* at 62–63.

"[O]ccupational evidence provided by a vocational expert 'generally should be consistent with the occupation information supplied by the DOT.'"  *Paz v. Comm'r of Soc. Sec.*, 2017 WL 1082684, at *36 (S.D.N.Y. Feb. 1, 2017) (citing SSR 00-4p (S.S.A. Dec. 4, 2000)).  The vocational expert in this case confirmed under oath that her testimony was consistent with the DOT.  Dkt. No. 14 at 63.  Accordingly, the ALJ was entitled to rely on the expert's testimony in concluding that Plaintiff was capable of working at jobs that existed in significant numbers in the national economy.

Plaintiff contends that the ALJ's decision and RFC are not supported by substantial evidence because the ALJ disregarded Dr. Bioh's opinion.  In particular, Plaintiff contends the

ALJ's determination at step four that Plaintiff could hold past jobs as a security guard and cashier checker was error.  Plaintiff points to the expert's testimony that an employer would likely not tolerate an employee (1) being off task for more than twenty percent of a work day; and (2) missing more than one day a month.  *Id.* at 67; Dkt. No. 18 at 14.  But these statements from the vocational expert are only probative insofar as one gives weight to Dr. Bioh's RFC assessment.  However, as explained above, the ALJ did not have to do so, and the ALJ adequately explained why she chose not to do so under the new regulations.

Plaintiff's contention confuses the two steps this Court must undertake in reviewing the Commissioner's final decision.  Under current regulations, the ALJ is permitted to decide what weight to assign Dr. Bioh's opinion in her decision as to Plaintiff's RFC and disability determination.  As explained above, the ALJ's dismissal of Dr. Bioh's medical opinion was not legal error.  Here, the Court has determined that substantial evidence backs the ALJ's decision. The Court need not agree with the ALJ's ultimate decision to decide that it is so supported.

Thus, the ALJ's denial of Plaintiff's DIB claim is free of legal error and supported by substantial evidence.

## CONCLUSION

For all the foregoing reasons, Plaintiff's motion to for judgment on the pleadings is DENIED, and Defendant's cross-motion for judgment on the pleadings is GRANTED.

The Clerk of Court is respectfully directed to close Dkt. Nos. 17 and 19 and to close the case.

SO ORDERED.

Dated: August 12, 2022
     New York, New York        _____
                                     LEWIS J. LIMAN
                        United States District Judge